UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17 CR 109 SNLJ (ACL) |
| | ) | |
| MARCUS JAMAL TURK, | ) | |
| | ) | |
| Defendant. | ) | |

## **REPORT AND RECOMMENDATION**

This matter was referred to the undersigned United States Magistrate Judge

pursuant to 28 U.S.C. § 636(b).  Pending before the undersigned is Defendant Marcus

Jamal Turk's Motion to Suppress Evidence (Doc. 35) seized following a stop of his

vehicle and search of his residence, as well as statements he made.

Turk claims that his Fourth and Fifth Amendment rights were violated by officers

on August 3, 2017.  Turk argues that he did not commit a traffic violation nor did officers

have reasonable suspicion he was involved in criminal activity to warrant a stop of his

vehicle.  He further claims he wasn't immediately given the *Miranda* warning following

the stop and officers promised he could go home if he cooperated, which tainted his later

waiver of rights and admissions.  Lastly, Turk suggests that officers commenced with a

search of his residence prior to a warrant being secured and that the Search Warrant was

not supported by probable cause.

The Government filed a Brief in Opposition to the suppression motion.  (Doc. 37.)

After an evidentiary hearing, both parties submitted memoranda.  (Docs. 47, 52.)   Five

law enforcement officers testified at the hearing.  Turk called one witness, his nephew, who was present at the residence while Turk's house was secured prior to the execution of the search warrant.

In consideration of the pleadings identified above, as well as all exhibits admitted into evidence, the undersigned recommends that the following findings of fact and conclusions of law be adopted; and that the Defendant's Motion to Suppress be denied.

## I.  Findings of Fact

The instant Indictment charges Turk with possessing more than 500 grams of methamphetamine, as well as quantities of cocaine and marijuana with the intent to distribute.  He is also charged with carrying a loaded .45 caliber semi-automatic pistol in connection with the drug trafficking crimes.  (Doc. 2.)

### Investigation of the Defendant's Drug Trafficking Activities

Turk's name first came to the attention of law enforcement in December of 2015. During the first half of 2017, officers concluded Turk was the supplier of methamphetamine that had been purchased by two separate informants during four separate controlled buys.  Details of the investigation are set out below.

In *December of 2015*, Task Force Officer (TFO) Bobby Sullivan received intelligence that Marcus Turk was involved in the distribution of methamphetamine.  The source of information (SOI) shared details about Turk because the SOI had been arrested for possessing methamphetamine with the intent to distribute.  Specifically, the SOI explained that Marcus Turk had been distributing between one and two ounces of methamphetamine to the SOI at least one time per week throughout the previous year.

The SOI added that Turk would meet him at two different store locations in Sikeston to complete the drug transactions.

Even so, it was not until early 2017 that a controlled purchase of methamphetamine was arranged that ultimately involved Turk.  TFO Sullivan secured the cooperation of a previously reliable confidential informant (CI #1) to purchase methamphetamine from a man named Derek Johnson.  CI #1 arranged to meet Johnson at a store in Sikeston.  On *February 8, 2017*, law enforcement officers conducted surveillance during the timeframe of the transaction.  Not only did Johnson and CI #1 arrive at the store, a man named Walter Spence and Turk also showed up.  Spence was a passenger in Turk's silver GMC pickup that Turk was driving.  Spence exited the truck and met with Johnson inside the store.  Security equipment in the store recorded an interaction between Spence and Johnson during which Spence provided an object officers believed was methamphetamine to Johnson.  Both men exited the store.  After Johnson provided the methamphetamine to CI #1, he delivered money to the passenger side of Turk's truck which is where Spence was seated.  A later search of CI #1's vehicle resulted in officers securing three ounces of methamphetamine and a recording of the incident.

On *March 22, 2017*, CI #1 was used to arrange a controlled purchase of three ounces of methamphetamine from Spence.  On that day, officers conducted surveillance of CI #1 and Turk's residence as they believed Turk was the supplier.  Prior to the transaction, Turk left his residence in a blue Dodge sedan, picked Spence up, and the pair drove to the store to meet CI #1.  Spence delivered three ounces of methamphetamine to CI #1 after being paid, and then Turk and Spence drove away.

A second reliable confidential informant (CI #2) was used to make a controlled purchase of methamphetamine on *April 24, 2017* from two men, Devon Conway and Mustafa Johnson.  Prior to the deal, Conway advised CI #2 that he was waiting for "his guy" to arrive, which investigators believed meant that Conway was waiting for his supplier to arrive with the drugs.  It wasn't long before Turk arrived in a blue Chevy Caprice.  Mustafa Johnson approached Turk's vehicle, briefly interacted with Turk, and then returned to CI #2 to transfer the one ounce of methamphetamine that had been ordered.  After receiving the buy money from CI #2, Johnson returned to Turk's vehicle to presumably pay for the methamphetamine and Turk left the location.

On *June 8, 2017*, CI #2 contacted Conway a second time to purchase more methamphetamine.  Once again, moments before the deal, officers observed Turk depart his Kate Street residence in his silver truck.  This time, Conway met CI #2 alone, received the buy money, and then walked it over to Turk.  When Conway returned to CI #2, he provided the informant with three ounces of methamphetamine.  After the transaction, officers followed Turk back to his Kate Street residence.

TFO Sullivan reported that all four transactions were recorded and methamphetamine was secured from the informants each time.   By June 8, 2017, the investigation resulted in controlled purchases of ten ounces of methamphetamine wherein Turk was the apparent supplier even though there was always a middle man between Turk and the informants.

## Vehicle Stop on August 3, 2017

A fifth controlled purchase of methamphetamine was arranged on August 3, 2017. CI #2 contacted Conway to buy four ounces.  Conway advised CI #2 that "his guy" lived right down the road from the meet location, would be off work around two in the afternoon and get the drugs at his house, and then Conway and "his guy" would meet CI #2.  Officers maintained surveillance on Turk's residence and sure enough, Turk returned to his Kate Street apartment as predicted and then made his way toward the meet location.  During that time, Conway called CI #2 to advise that they were less than five minutes away.

Before Turk could make it to the meet location, however, TFO Sullivan requested that an investigative stop be made on Turk's vehicle.  Sikeston Department of Public Safety Officer Benjamin Quick initiated a stop of Turk's truck at 3:15 p.m.  Turk drove at least one full block during which time he was fidgeting with items in his vehicle.  As it turned out, Turk poured most of a bag of methamphetamine into a beverage within his vehicle.  Canine Officer Franklin Adams had to pull in front of Turk's truck to force Turk to stop the vehicle.

When the officers approached Turk's truck, both Officer Quick and Officer Adams drew their firearms and instructed Turk to show his hands, because Turk was leaned over and his hands were around the bottom of his seat.  Turk raised his hands and the officers observed a crystal-like substance on Turk's lap, his seat, the console, and the floorboard.   There was also a handgun lying in the floorboard of the driver's seat.

After Turk was secured, Officer Adams explained that Canine Levi went into narcotic detection mode as there was controlled substance strewn about the driver's area of the vehicle and the odor was overwhelming for the dog.  Levi alerted to the interior of the driver's side door and floorboard of the truck; he repeatedly turned his nose back and forth between those locations.

### Turk's Statements following the Vehicle Stop

Shortly after Turk was secured in a patrol car, three Drug Enforcement Administration (DEA) Agents sat in the vehicle with Turk and encouraged him to cooperate.  No *Miranda* warning was given.    DEA Agent Mike Cossou advised Turk it would be in his best interest to cooperate.  DEA Resident Agent-in-Charge (RAC) Bryan Barger suggested that cooperation might result in Turk being able to go home.  That being said, Agent Cossou testified "there was no guarantee of [Turk] going home that evening."  (Doc. 42, transcript of the April 11, 2018 suppression hearing, at 79.)  Turk did not make any incriminating statements in the patrol car.  The conversation lasted five minutes or less.

Turk was transported to the police station and an interview began at approximately 3:33 p.m.  Prior to asking any questions, Agent Cossou reviewed an "Advice of Rights" form (Gov't. Ex. #2) with Turk.  The form had two sections, including "Your Rights" and "Waiver of Rights."  The first part provided:

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during the questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

(Gov't. Ex. #2.)  Turk signed his initials before each of the five rights listed.

The second part of the "Advice of Rights" form included the following statement with options for the reader to mark:

> [  ]  I have read or [  ] someone has read to me this advice of rights and I understand what my rights are.  At this time, I am willing to freely and voluntarily answer questions without a lawyer present.

*Id*.  Turk signed his name below the statement but did not mark whether he read the form himself or if someone had read the form to him.  Both Agent Cossou and RAC Barger signed the form as witnesses at 3:34 p.m.  The form did not include a blank for when the interview ended.  While the officers believed the interview was being recorded, as there were red indicator lights on the equipment, when a technician attempted to download a copy of the recording from the server it was learned that the interview had not been recorded.

Agent Cossou testified that he reviewed the *Miranda* rights contained on the form with Turk.  He also stated that Turk indicated he understood his rights, signed the waiver, and made no complaints to the officers.  Agent Cossou described Turk's demeanor as very polite and that Turk did not appear to be under the influence of any drugs.   In addition, Agent Cossou reported that no threats or promises were made to Turk in exchange for his statement.

During the course of the interview, Turk made numerous incriminating statements. He also explained where various controlled substances and firearms would be found in his Kate Street residence. When the officers asked Turk to work as an informant, Turk wanted guarantees that the DEA was not able to offer. Before making a decision, Turk indicated he wished to speak with a lawyer about what he should do.

The interview concluded around 4:00 p.m. TFO Sullivan entered the room near the conclusion of the interview and shared that a search warrant was being secured for Turk's house.

### Search of Turk's Residence

Before the day of the vehicle stop, TFO Sullivan had prepared a Search Warrant Application and Affidavit detailing his investigation of Turk except for the details about arranging the August 3, 2017 controlled buy and subsequent investigative stop. After the stop, TFO Sullivan added a single paragraph, that being paragraph 10, to the Affidavit. An Assistant Prosecutor reviewed the packet at 3:54 p.m., TFO Sullivan signed the packet at 3:57 p.m., and emailed it to Judge Horman for review after speaking with the Judge on the telephone. Judge Horman signed the Search Warrant for "Illegal Drugs, Paraphernalia, or United States Currency" at 4:19 p.m., and emailed it back to TFO Sullivan.

Following the stop of Turk's truck, officers were sent to the Kate Street house to maintain security of the contents while the Search Warrant was being sought. Since the investigation had revealed Turk utilized other individuals to assist him in the distribution

of methamphetamine, the officers wanted to be sure that Turk had not sent some of his cohorts to his residence to destroy, or remove evidence.

When the officers arrived, they knocked on the door and Turk's juvenile nephew answered the door. The officers told the young man that a search warrant for the residence was anticipated; and they needed to conduct a protective sweep of the home and take control of it until the warrant was secured. The juvenile allowed the officers to enter; asked if he could continue playing video games and the officers responded affirmatively. The officers checked the residence for other occupants and found all was clear. They lifted some of the cushions on the couch where the juvenile was seated to be sure there were no firearms and none were located. No evidence was seized during the protective sweep nor was any mention of observations made during the sweep included in TFO Sullivan's Affidavit in support of the Search Warrant.

When the Search Warrant was authorized, a full search commenced and numerous items of evidence were located, including: a large quantity of methamphetamine, more than one brick of cocaine, more than 16 bricks of marijuana, two sets of digital scales, $3,855 cash, loaded firearms, and ammunition. A second search of the couch where the Turk's nephew was seated yielded the discovery of a firearm. TFO Sullivan's Return and Inventory reflects that he delivered a receipt of the articles taken to "the person in possession of said articles" at 5:00 p.m.

The juvenile nephew testified for his uncle. He claimed the officers came to his uncle's residence three times, beginning at 3:05 p.m., and that the search was completed by 4:00 p.m. The first time the officers knocked, he told them they couldn't come in

without a warrant.  The second time they came back with a warrant and asked him to sign it; the nephew said he signed it but didn't read it, and let the officers enter the house.  He said that he played video games while the officers conducted the search and left the house around 3:35 p.m.  The nephew admitted that the officers searched under the couch cushions where he was seated and did not initially find anything but later found a gun. He also said that he heard the officers "crack" a safe that was in the master bedroom and he saw it "split in half."  (Doc. 42 at 112.)  It is not clear what the nephew believes happened during the officers' third visit.  In any event, he alleges that after walking approximately one mile toward his grandmother's home she picked him up, they returned to Turk's residence, and the officers had finished the search and were leaving just before 4:00 p.m.  He testified that his grandmother unlocked the front door and all sorts of items were strewn about the floor.  The undersigned finds the nephew's testimony is not credible in light of the inherent inconsistencies with the complete record of the case.

Turk now requests suppression of the evidence seized and statements he made following the investigative stop on August 3, 2017, as well as the items seized from his residence.

## II.  Conclusions of Law

Turk believes that the person who authorized the stop of his truck "did so unlawfully, and without any reasonable suspicion which would justify a seizure of [his person or vehicle]" resulting in a violation of his Fourth Amendment rights.  (Doc. 35 at 2.)

Next, Turk alleges that DEA agents prevented police officers from giving him a *Miranda* warning at the scene of the stop, an agent promised he would go home that night if he cooperated, and his later signature on a waiver of rights form was tainted by the stop of his vehicle and the officer's alleged promise that he could go home. *Id*. at 2-3.

Finally, Turk believes that his home was searched before a search warrant was secured by law enforcement officers. He also alleges that the information contained in the Affidavit attached to the Search Warrant Application was insufficient to constitute probable cause. *Id*. at 4.

The undersigned concludes that even though Turk did not commit a traffic violation, TFO Sullivan had reasonable suspicion that Turk was involved in criminal activity at the time of the investigative stop based on the cumulative information that was available at the time of the stop. In addition, Turk's incriminating statements were made following a knowing waiver of his *Miranda* rights, and his will was not overborne by the officers. Finally, the search of Turk's residence was conducted after a valid Search Warrant, supported by probable cause, was authorized by a Judge. A more thorough analysis follows.

## II.A.   The Stop of Turk's vehicle was a valid *Terry* stop.

Turk's first argument is that the he did not commit a traffic violation and the only reason his vehicle was stopped was so the officers could follow up on a hunch that he was involved in drug trafficking.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures..." U.S.

Const. amend. IV.  In *Terry v. Ohio*, 392 U.S. 1, 30 (1968), the Court held that an officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion based on his experience that criminal activity is afoot.  *See also United States v. Bell*, 183 F.3d 746, 749 (8th Cir. 1999) (An investigative stop of a vehicle "does not violate the Fourth Amendment if the police have reasonable suspicion that the vehicle or its occupants are involved in criminal activity."). There is no requirement that there be a traffic violation.  *See Alabama v. White*, 496 U.S. 325 (1990) (upholding stop of vehicle in absence of traffic violation).  *See also United States v. Mora-Higuera*, 269 F.3d 905, 909 (8th Cir. 2001) (a stop may be justified even where no traffic violation has occurred.)

The level of suspicion required to justify a stop is "considerably less than proof of wrongdoing by a preponderance of the evidence" and must be evaluated under "the totality of the circumstances."  *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989). Reasonable suspicion is a particularized and objective basis for suspecting the person stopped of criminal activity.  *United States v. Thomas*, 249 F.3d 725, 729 (8th Cir. 2001). Whether there is reasonable suspicion to justify a *Terry* stop depends upon the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop.  *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002).  "Reasonable suspicion is based on 'specific and articulable facts,' *Terry*, 392 U.S. at 21, which are considered collectively and "in light of the significance that a law enforcement officer experienced in detecting criminal activity would attach to them." *United States v. Quarles*, 955 F.2d 498, 501 (8th Cir. 1992) (citing *United States v.*

*Turpin*, 920 F.2d 1377, 1385 (8th Cir. 1990)).  "The 'reasonable suspicion' necessary to justify [a *Terry*] stop is dependent upon both the content of the information possessed by the police and its degree of reliability.'"  *Navarette v. California*, 134 S.Ct. 1683, 1687 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1999)).  "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in their totality."  *United States v. Tutley*, 161 F.3d 513, 515 (8th Cir. 1998) (per curiam).

"Because reasonable suspicion is a less demanding standard than the probable cause required for an arrest, it 'can arise from information that is less reliable than that required to show probable cause…'"  *United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).  "A tip from a known informant can suffice by itself to establish reasonable suspicion" for a *Terry* stop, even if the police do not corroborate the tip prior to the stop with their own independent observation."  *United States v. Spotts*, 275 F.3d 714, 720 (8th Cir. 2002) (citing *Adams v. Williams*, 407 U.S. 143, 146-47 (1972)). "An anonymous tip can also provide reasonable suspicion by itself, but only if it is sufficiently corroborated at the time of the stop." *Id*. (interim citations omitted).

The record here supports that TFO Sullivan was acting on more than a mere hunch when he asked Officer Quick to stop Turk's vehicle.  As the Supreme Court emphasized in *Terry*, "it is imperative that the facts be judged against an objective standard:  would the facts available to the officer at the moment of the seizure or search 'warrant a man of

reasonable caution in the belief' that that the action taken was appropriate?" *Terry*, 392 U.S. at 21-22.

In this case, TFO Sullivan's investigation included statements from three separate informants whose collective information demonstrated that Turk had been involved in drug trafficking for nearly two years. Within the six months preceding the stop, four controlled buys had been conducted wherein the officers' observations supported that Turk acted as the source of supply. The surveillance and information available at the time of the stop consisted of CI #2 making an order of drugs from an associate of Turk, the associate advising CI #2 "his guy" was on the way, and Turk driving in the direction of the meet location after having stopped at his residence. Consequently, TFO Sullivan had reasonable suspicion to believe Turk was in possession of the methamphetamine that had been ordered by CI #2. Those suspicions were immediately confirmed when Turk finally stopped his vehicle and the officers approached him. Although Turk attempted to destroy the methamphetamine before he stopped by pouring it into a cup of soda, Turk was literally covered in the drug. The officers observed a crystal-like substance on Turk's lap, his seat, the console, and the floorboard. They also observed a firearm at Turk's feet which posed a threat of danger to the officers.

The Court finds the stop and search of Turk's vehicle was according to law and constitutional.

## II.B.  Turk's Statements

As previously noted, Turk claims that DEA agents prevented police officers from giving him a *Miranda* warning at the scene of the stop, and an agent promised he would

go home that night if he cooperated.  In his post-hearing Memorandum, Turk concedes that no case law supports his position that his will was overborne by the actions of the officers, "however, [he] does not hereby abandon or waive this claim."  (Doc. 47 at 6.) Turk then cited two cases with similar facts wherein the Eighth Circuit concluded that statements and inducements by officers were not sufficient to overcome the free will of the defendant, and did not render the statements made involuntary.  *United States v. Pierce*, 152 F.3d 808, 812-13 (8th Cir. 1998); and *United States v. Mendoza*, 85 F.3d 1347, 1350-51 (8th Cir. 1996).  *See also Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001).  Turk did not present any evidence to support that the conversation at the scene of the stop, or any other actions on the part of the officers resulted in him providing an involuntary statement.

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'"  *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011), quoting *Segura v. United States*, 468 U.S. 796, 804 (1984).  In addition, "[v]erbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search."  *United States v. Yousif*, 308 F.3d 820, 832 (8th Cir. 2002), citing *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).  "[T]he defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence."  *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007).

The appropriate test for determining the voluntariness of a confession is "whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will." *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992) (quoting *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989)).  In analyzing the "overborne will" test, the court looks at the conduct of the officers and the capacity of the suspect to resist pressure to confess. *Id.* (citing *Colorado v. Connelly***,** 479 U.S. 157 (1986)).  A waiver is "voluntary" if it was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception. *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2005).

In this case, as conceded by Turk, the brief conversation at the scene of the stop was not improper.  The DEA Agents simply encouraged Turk to cooperate.  Once at the station, Turk was given the *Miranda* warning.  Turk is a high school graduate and has maintained full-time employment for nearly a decade.  He acknowledged he understood all of his rights.  In fact, even though he had no record of interacting with law enforcement, Turk was savvy enough to advise the officers he wanted to consult with a lawyer before deciding if he would cooperate with law enforcement as an informant.  The record of the case demonstrates that Turk's statements to law enforcement were made freely and that he further advocated for concessions from the officers in exchange for his proactive cooperation.

Turk's decision to admit much of his illegal conduct was a deliberate choice that was freely made and not the product of intimidation, coercion, or deception.  Turk's request for suppression of his statements should be denied.

**II.C.  The Search of Turk's Residence**

In his post-hearing brief, Turk "suggests that the inappropriate protective sweep and the unsupported search warrant require the court to suppress any evidence obtained from [his] residence." (Doc. 47 at 13.)  Turk argues that the Supreme Court does not allow for a protective sweep in all cases rather a sweep must be justified on an individualized basis. *Id*. at 47.  He also claims that the Search Warrant was not supported by probable cause but instead relayed a "series of transactions. . .where [Turk] may have been present, but was always with someone else" and that doesn't "give rise to a probability that there is something illegal located in [Turk's] place of residence." *Id*. Finally, Turk claims the search of his residence took place before the Search Warrant was secured and all evidence seized could be suppressed on that alternative ground.

**II.C.1.  Warrantless Entry to Prevent Destruction of Evidence was Lawful**

Although warrantless entries into a person's home are presumed to be unreasonable under the Fourth Amendment, *see Katz v. United States*, 389 U.S. 347 (1967), the Supreme Court has consistently held that certain exigent circumstances may justify a warrantless entry.  *See Roaden v. Kentucky*, 413 U.S. 496, 505 (1973).  "The [exigent circumstances] exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996).

"The analysis of whether this exception to the warrant requirement has been made out is an objective one 'focusing on what a reasonable, experienced officer would believe.'" *United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003) (quoting *In re*

*Sealed Case 96–3167,* 153 F.3d 759, 766 (D.C.Cir. 1998)).  When the totality of the circumstances support an officer's reasonable belief "that destruction of evidence is likely to occur and could be prevented by entering and securing the premises," such exigency justifies warrantless entry into home.  *United States v. Amburn*, 412 F.3d 909, 916 (8th Cir. 2005).

The Supreme Court has also held that the Fourth Amendment does not require the suppression of evidence initially discovered during an illegal entry if that evidence is seized during a later search pursuant to a warrant that is not based on evidence obtained during the illegal entry.  *See Murray v. United States*, 487 U.S. 533, 541-42 (1988) (discussing the independent source doctrine in the context of a warrantless entry into a warehouse for drugs followed by a search pursuant to a valid search warrant).

After the stop of Turk's vehicle it was not unreasonable for officers to fear that Turk may have requested the assistance of others to destroy evidence at his home.  Turk did not immediately stop after Officer Quick activated his lights and siren on his patrol car.  Instead it took Turk nearly two whole blocks to stop, during which time he destroyed a quantity of methamphetamine and had time to direct his confederates to destroy evidence at his home.  As it turned out, Turk's nephew was home and could have been directed to destroy evidence.

When the officers knocked and announced their presence, the nephew answered the door.  The officers advised the nephew that they were in the process of securing the residence and they wanted to conduct a sweep of the residence to make sure it was secure.  The young man allowed the officers to enter, the residence was secured, and the

officers waited for TFO Sullivan to report that a Search Warrant had been secured.
Nothing of evidentiary value was observed during the protective sweep and no
information gained from the sweep was included in the Affidavit for the Search Warrant.

The totality of the circumstances justified the warrantless search of Turk's
residence.  Even if the protective sweep was not justified, suppression is not required
because the evidence that was ultimately seized from the residence was secured pursuant
to a valid search warrant.

## II.C.2. The search warrant was supported by probable cause.

Probable cause to issue a warrant exists when an affidavit sets forth sufficient facts
to justify a prudent person in the belief that contraband will be found in a particular place.
*See Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Whether probable cause has been
established involves the practical common sense evaluation of the totality of the
circumstances.  *Gates*, 462 U.S. at 238.

The quantum of evidence needed to meet this probable cause standard has been
addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, however, as the very name implies, we deal
> with probabilities. These are not technical; they are the factual and practical
> considerations of everyday life on which reasonable and prudent men, not
> legal technicians, act.

*Brinegar v. United States*, 338 U.S. 160, 175 (1979).

Probable cause is a "fluid concept turning on the assessment of probabilities in
particular factual contexts--not readily or even usefully reduced to a neat set of legal
rules."  *Illinois v. Gates*, 462 U.S. 213, 232.  Further, probable cause in an affidavit "must

be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* at 632. All that need be shown for probable cause to search is that there is a "fair probability" that contraband or evidence of a crime will be found at the premises to be searched. *Gates, supra.* Also, affidavits should not be read in a hypertechnical manner. *See United States v. Ventresca*, 380 U.S. 102 (1965).

Given the above, the undersigned concludes that there was sufficient probable cause to search the premises of Turk's residence for illegal drugs, paraphernalia, or United States currency. The Affidavit revealed that over the most recent six month period, two confidential informants purchased quantities of methamphetamine from individuals who interacted directly with Turk in order to accomplish the transactions. This happened four times under circumstances similar to those described by a source of information who admitted purchasing methamphetamine from Turk for approximately one year at least once per week. Prior to two of the four controlled purchases (on March 22 and June, 8, 2017), Turk was at his residence or stopped at his residence before meeting with his associates to complete drug transactions with the informants. Finally, TFO Sullivan included information in his Affidavit that based on his experience and training:

> people involved in the regular distribution of methamphetamine and /or other illegal drugs keep evidence related to their drug activity in the locations in which they can control and feel comfortable, namely their homes and vehicles.

*See* Gov't. Ex. #1, Affidavit at ¶ 13. He further stated:

> Given the facts of this case, where officers have observed TURK leave his residence and travel directly to a drug deal and then return home with "buy" money, I believe that evidence of TURKS' drug activity will be located in both his home and his vehicles.

*Id.*

In consideration of the foregoing, the undersigned concludes that there was at least a "fair probability" that items relating to illegal drugs, paraphernalia, or United States currency would be found within Turk's home. Therefore, probable cause existed to search Turk's residence.

As to Turk's suggestion that the officers conducted a search of his residence prior to the Search Warrant being secured, there was no evidence to support this argument other than his nephew's testimony which was not credible. As such, this claim is unfounded.

## II.C.3.        Good Faith

Further, while evidence obtained as a result of a potentially defective search warrant is generally inadmissible, there is an exception for evidence found by officers relying in objective good faith on a defective search warrant. *See United States v. Leon*, 468 U.S. 897, 920, 921 (1984). There are, however, four circumstances in which the *Leon* good faith exception does not apply. They are as follows:

> . . .(1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) " the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) the warrant is "so facially deficient. . .that the execut-

ing officers cannot reasonably presume it to be valid."

*United States v. Guzman*, 507 F.3d 681, 685 (8th Cir. 2007).  *See also Leon*, 468 U.S. 897 at 832.

Based on the above, the undersigned concludes that the totality of the circumstances support that it was objectively reasonable for the officers to rely on the Search Warrant in this case and that they did so in good faith.  First, there is no allegation that Judge Horman was misled by any statements contained in the Affidavit, or that he wholly abandoned his judicial role in signing the Search Warrant.  Next, in consideration of the information contained in the entire Affidavit, it was reasonable for both the officer and the judge to believe that evidence of drug trafficking would be found at Turk's residence.  Further, TFO Sullivan acted reasonably in taking the necessary steps to present the Application for Search Warrant to Judge Horman and secure judicial approval for the search before a full search of Turk's residence commenced.  Therefore, the undersigned concludes that even if the Warrant and Affidavit were not supported by probable cause, the good faith exception under *Leon* should apply.

### III.  Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Evidence (Doc. 35) be **denied**.

Further, the parties are advised that they have fourteen days, not later than July 30, 2018, in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained.  Failure to file timely objections may result

in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of July, 2018.